311 F.3d 534
 HOTEL EMPLOYEES & RESTAURANT EMPLOYEES UNION, LOCAL 100 OF NEW YORK, N.Y. & VICINITY, AFL-CIO, Henry J. Tamarin, as President and Dennis Diaz, as agent thereof, Plaintiffs-Appellants,
v.
CITY OF NEW YORK DEPARTMENT OF PARKS & RECREATION, Henry J. Stern, as Commissioner, Robert Lawson, as Director of Special Events for Manhattan, Lincoln Center For The Performing Arts, Inc., as agent thereof, Defendants-Appellees.
 Docket No. 01-7602.
 United States Court of Appeals, Second Circuit.
 Argued July 17, 2002.
 Decided November 18, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Michael T. Anderson, Davis, Cowell & Bowe, Boston, MA (Jamin R. Sewell, Office of the Counsel, Local 100, H.E.R.E., AFL-CIO, New York, NY, on the brief), for Plaintiffs-Appellants.
 Kathleen Alberton, for Michael D. Hess, Corporation Counsel of the City of New York, Brooklyn, NY (Larry Sonnenshein, of counsel), for Defendant-Appellee City of New York Department of Parks & Recreation, et. al.
 Charles S. Sims, Proskauer Rose L.L.P., New York, NY (Stefanie S. Kraus, on the brief), for Defendant-Appellee Lincoln Center for the Performing Arts, Inc.
 Christopher Dunn, New York Civil Liberties Union Foundation, New York, NY (Arthur Eisenberg, on the brief) and Mark Lopez, American Civil Liberties Union Foundation, New York, NY, for amici curiae New York Civil Liberties Union Foundation and American Civil Liberties Union Foundation.
 Before: CABRANES, STRAUB, and SOTOMAYOR, Circuit Judges.
 STRAUB, Circuit Judge.
 
 
 1
 Plaintiffs-Appellants Hotel Employees & Restaurant Employees Union, Local 100, AFL-CIO, Henry J. Tamarin, President, and Dennis Diaz, as agent thereof (collectively "the Union") appeal from a judgment entered by the United States District Court for the Southern District of New York (Kevin Thomas Duffy, Judge) granting summary judgment in favor of Defendants-Appellees City of New York Department of Parks & Recreation, Henry Stern, Commissioner, and Robert Lawson, Director of Special Events for Manhattan (collectively "Parks Department" or "the City") and Defendant-Appellee Lincoln Center for the Performing Arts, Inc. ("Lincoln Center, Inc."), a not-for-profit corporation. The Union brings a First Amendment challenge to Lincoln Center, Inc.'s policy limiting organized public expression in the City-owned fountain plaza, known as Josie Robertson Plaza ("the Plaza"), which is located at the center of the Lincoln Center performing arts complex in Manhattan. Pursuant to its stated policy, Lincoln Center, Inc. limits expression in the Plaza to events having an artistic or performance-related component, resulting in a prohibition on political rallies, demonstrations, and leafletting. The Union challenges the policy both on its face and as applied to its proposed actions. We hold that the Plaza is not a traditional public forum and that Lincoln Center, Inc.'s policy, and therefore its application to the Union's proposed activities, is constitutionally permissible because it is both viewpoint neutral and reasonable. Accordingly, we affirm.
 
 BACKGROUND
 I. FACTS
 A. Lincoln Center
 
 2
 The Lincoln Center performing arts complex is located on the Upper West Side of Manhattan. The Plaza, which is situated adjacent to Columbus Avenue between West 62nd and West 65th Streets, is an outdoor square that serves as the centerpiece of the Lincoln Center complex. The Plaza is bounded by Avery Fisher Hall on the north, the Metropolitan Opera House on the west, the New York State Theater on the south, and Columbus Avenue on the east. The Vivian Beaumont Theater, the New York Public Library for the Performing Arts, and the Juilliard School are located farther north and west in the complex. A fountain is situated in the Plaza's center, and public access to the Plaza is unrestricted. While the Plaza opens onto Columbus Avenue and is reached by climbing a flight of stairs, public entranceways also connect to the Plaza from the sidewalks surrounding Lincoln Center, which facilitate access to the Plaza and its surrounding buildings and permit pedestrians to cross the Plaza en route to other destinations in the neighborhood. See generally Edgar B. Young, Lincoln Center: The Building of an Institution 140-41, 183, 250, 261 (1980) (hereinafter Young, Lincoln Center) (featuring descriptions, maps, and photographs of the Plaza); see also Appendix (containing diagram of Lincoln Center complex reproduced in Young, Lincoln Center, at 141).[1]
 
 
 3
 The Lincoln Center complex was conceived as part of an urban renewal project in the 1950s, pursuant to which the City of New York condemned the land upon which Lincoln Center now stands and entered into plans with the Metropolitan Opera and the New York Philharmonic to construct an arts and education center. See Young, Lincoln Center, at 15-16, 35-37. The land was initially purchased by Lincoln Center, Inc., a not-for-profit corporation formed by John D. Rockefeller 3rd and Opera and Philharmonic officials. See id. at 19, 33-34, 40-41, 51. Construction of Lincoln Center was funded by a combination of federal grants, state and city funds, and private donations. See id. at 140.
 
 
 4
 Site plans called for an "entrance plaza" to the complex, along with a park (later named Damrosch Park) situated to the south between Fordham University and the opera house, and the North Plaza, to be located on the north side of the complex between the philharmonic building and the drama theater. See id. at 80, 141. To defray the costs of construction, the City agreed to build and oversee the plaza and park areas, together with an underground garage. See id. at 68, 85. As the financial arrangements were finalized, Lincoln Center, Inc. conveyed a portion of the buildings and public grounds, including the Plaza, to the City. The grounds were placed under the jurisdiction of the Parks Department, which is a municipal agency organized and operated under the New York City Charter.
 
 
 5
 Four years after the complex opened, Lincoln Center, Inc. took over management of the public areas[2] and garage pursuant to a License Agreement ("License Agreement"). Under the License Agreement, Lincoln Center, Inc. agreed to accept "engagement by the City, on behalf of and as an agent of the City, to manage and maintain the Premises ...." Lincoln Center, Inc.'s management of the Lincoln Center property continues to this day.
 
 
 6
 Pursuant to Article 8 of the License Agreement, Lincoln Center, Inc. has exclusive responsibility for scheduling events in the public areas at Lincoln Center, including the Plaza, subject to approval from the Parks Department. Lincoln Center, Inc.'s scheduling authority does not extend to Damrosch Park. The License Agreement provides that Lincoln Center, Inc. may charge fees and require bonds in connection with events in the public areas, but that rates shall be "set at such levels so as not to discourage public use." The License Agreement also requires Lincoln Center, Inc. to forward written notice of all approved applications to the Parks Department, which in turn is to notify Lincoln Center, Inc. of its approval or disapproval. The Director of Community Programming for Lincoln Center, Inc. attests that, in practice, Lincoln Center, Inc. exercises sole authority to grant applications for organized public use of the Plaza and surrounding public areas.
 
 
 7
 In exercising its scheduling authority, Lincoln Center, Inc. stages its own events and permits other events that will benefit the Center financially. As to all other requests by third parties for use of the Plaza and public areas, Lincoln Center, Inc. states that it has traditionally limited approval to events "having a performance, entertainment or artistic component." Lincoln Center, Inc.'s policy therefore prohibits political and labor-oriented events, including demonstrations and rallies. When it denies applications for these types of activities, Lincoln Center, Inc. suggests that the applicant approach the Parks Department for permission to use Damrosch Park, located on the south end of Lincoln Center, Dante Park, located across the street, or the sidewalks surrounding Lincoln Center. The Parks Department maintains scheduling authority for Damrosch and Dante Parks and permits expressive uses therein pursuant to the permit requirements contained in the Parks Department Rules and Regulations. Further, the Director of Community Programming for Lincoln Center, Inc. states in her uncontested affidavit that "[w]hen electioneering or leafletting or the like has been spotted on the Plaza (i.e. without a prior request), Lincoln Center has notified security and the local police, and the participants have been told to move."
 
 B. The Present Dispute
 
 8
 The Union represents approximately 6,000 food service workers employed in various restaurants, cafeterias, and entertainment venues in the New York metropolitan area. The Union claims, and the defendants do not dispute, that on or about March 22, 1999, a union employee was prohibited from distributing leaflets in the Plaza by Lincoln Center, Inc. security and the police department, who threatened him with arrest. On May 21, 1999, the Union filed a written application with the Parks Department requesting permission to hold a rally in the Plaza consisting of forty persons. The Union planned to picket and distribute leaflets, and to station its members behind physical barriers primarily on the west side of the Plaza. The proposed rally was to take place from 4:00 p.m. to 7:30 p.m. on June 5, 1999, and its purpose was to show support for food service workers employed by Restaurant Associates, a food concessionaire operating within the Metropolitan Opera. Although the Union did not represent the concession employees, it was seeking to do so at the time.[3]
 
 
 9
 The Parks Department forwarded the Union's request to Lincoln Center, Inc.,[4] and on May 26, 1999, Lincoln Center, Inc. denied the Union's application because the proposed use violated its policy against non-arts-related events in the Plaza.[5]
 
 II. PROCEDURAL HISTORY
 
 10
 On June 3, 1999, following rejection of its application to stage a rally, the Union filed a complaint in the Southern District of New York seeking declaratory and injunctive relief. The complaint alleged that the Union's First and Fourteenth Amendment rights had been violated by the defendants' refusal to permit a labor rally in the Plaza. The Union also sought a preliminary injunction allowing the rally to go forward. After a hearing on June 4, 1999, Judge Lawrence M. McKenna denied the application for an injunction on the basis that the Plaza is a limited public forum which has "for many years been limited to use for performance, entertainment and artistic uses." Judge McKenna found that the policy as applied to political protests and demonstrations in the Plaza has been consistent, and that the policy is viewpoint neutral and reasonable in relation to the forum's overall purpose.[6]
 
 
 11
 On June 11, 1999, the Union filed an amended complaint in which it added a challenge to the defendants' refusal to permit leafletting in the Plaza. The case was reassigned to Judge Kevin Thomas Duffy, and the parties filed cross-motions for summary judgment. The Union argued that the Plaza is a traditional public forum in which heightened constitutional protections attach, and that several newspaper articles reveal that the Plaza was used for a variety of political demonstrations in the 1980s, indicating that Lincoln Center, Inc.'s rejection of the Union's application was viewpoint-based. The defendants responded that the Plaza is a non-public forum, or at most a limited public forum, in which restrictions on speech need only be reasonable. Lincoln Center, Inc. also argued that it is not a state actor, and as such, its regulation of the Plaza is not subject to constitutional scrutiny.
 
 
 12
 Judge Duffy assumed for the purposes of deciding the motions that Lincoln Center, Inc. is a state actor. He ruled that the newspaper articles proffered by the Union were inadmissible hearsay, and that in any event they showed only that various events were either located near Lincoln Center or had yet to take place when the articles were written.[7] Judge Duffy agreed with Judge McKenna's prior ruling that Lincoln Center, Inc. can lawfully prohibit political speech in the Plaza, because although the Plaza is a limited public forum for performances of an "arts-oriented nature," Lincoln Center, Inc. has a long-standing policy against non-arts-related events that is "consistent with the purposes for which Lincoln Center was created" and is "entirely reasonable." Judge Duffy noted that "Lincoln Center was designed to be a place apart, dedicated to the performing arts, used principally for the gathering of those attending performances therein." Accordingly, the District Court denied the Union's motion for summary judgment and granted those of the defendants.
 
 
 13
 On appeal, the Union argues that the District Court erred in concluding that the Plaza is a limited public forum. The Union asserts that the Plaza is a traditional public forum because it is either a public park, which is a quintessential public forum, or a public place that is functionally equivalent to a park, sidewalk, or thoroughfare. As such, the Union urges, restrictions on speech in the Plaza are subject to strict scrutiny — notwithstanding the City's prior history of limiting speech in the Plaza or its intent in constructing the space. In response, the defendants renew their arguments that Lincoln Center, Inc. is not a state actor, and that the Plaza is either a non-public forum or a limited public forum in which restrictions on speech need only be reasonable and viewpoint neutral.
 
 DISCUSSION
 I. STANDARD OF REVIEW
 
 14
 We review de novo a district court's grant of summary judgment, "drawing all factual inferences and resolving all ambiguities in favor of the nonmoving party." Tri-State Employment Servs., Inc. v. Mountbatten Sur. Co., Inc., 295 F.3d 256, 260 (2d Cir.2002). Summary judgment is appropriate only where "there is no genuine issue as to any material fact." Koch v. Town of Brattleboro, 287 F.3d 162, 165 (2d Cir.2002) (internal quotation marks omitted). Where cross-motions for summary judgment are filed, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir.1993) (internal quotation marks omitted).
 
 II. STATE ACTION
 
 15
 The defendants advance the argument that as a private not-for-profit corporation, Lincoln Center, Inc.'s decisions regulating speech in the Plaza are not subject to constitutional scrutiny.
 
 
 16
 "It is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee only against abridgment by government, federal or state." Hudgens v. NLRB, 424 U.S. 507, 513, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). Where a private party's actions are challenged, "state action may be found [only] if ... there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (internal quotation marks omitted); see also Loce v. Time Warner Entm't Advance/Newhouse P'ship, 191 F.3d 256, 266 (2d Cir.1999).
 
 
 17
 Lincoln Center, Inc. argues that it exercises sole responsibility for scheduling events in the Plaza and that it developed its policy limiting organized expression to artistic and performance-related events without involvement from the City. The Union responds that, pursuant to the plain terms of the parties' License Agreement, Lincoln Center, Inc. manages the Plaza on the City's behalf and therefore acts as its agent when it schedules events. The Union also argues that the City may not insulate itself from liability by delegating this public function to Lincoln Center, Inc.
 
 
 18
 Both District Judges declined to reach the issue of state action because they found that no constitutional violation had occurred, thus rendering unnecessary a determination of whether Lincoln Center, Inc. is a state actor. Because we also find no constitutional violation, we will assume, without deciding, that the parties' License Agreement renders Lincoln Center, Inc. a state actor for purposes of event-scheduling in the Plaza.
 
 III. FIRST AMENDMENT ANALYSIS
 
 19
 Political and labor-related rallies, demonstrations, and leafletting are forms of speech protected under the First Amendment. See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 687, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992); United States v. Kokinda, 497 U.S. 720, 723, 725, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990); Frisby v. Schultz, 487 U.S. 474, 479, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). Accordingly, Lincoln Center, Inc.'s refusal to permit these activities in the Plaza is subject to constitutional scrutiny.
 
 A. Public Forum Doctrine
 
 20
 Under the prevailing constitutional framework, speech restrictions imposed by the government on property that it owns are analyzed under a "forum based" approach. Lee, 505 U.S. at 678, 112 S.Ct. 2701; see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797, 799-800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44-46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 128 (2d Cir.), cert. denied, 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998). As a general matter, the government is permitted to exercise control over the public's use of government-owned property for expressive purposes, and the degree of control permitted depends upon the nature of the property and the speech restrictions imposed thereon. See Cornelius, 473 U.S. at 797, 799-800, 105 S.Ct. 3439; N.Y. Magazine, 136 F.3d at 128.
 
 
 21
 The first category of property is the "traditional" public forum, which has been defined as a forum that has "traditionally been available for public expression," Lee, 505 U.S. at 678, 112 S.Ct. 2701, and has as "a principal purpose ... the free exchange of ideas." Cornelius, 473 U.S. at 800, 105 S.Ct. 3439; see also id. at 802, 105 S.Ct. 3439 ("Traditional public fora are those places which by long tradition or by government fiat have been devoted to assembly and debate." (internal quotation marks omitted)). The classic examples of traditional public fora are streets, sidewalks, and parks, which are properties that "`have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" Perry, 460 U.S. at 45, 103 S.Ct. 948 (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)); see also Gen. Media Communications, Inc. v. Cohen, 131 F.3d 273, 278 (2d Cir.1997), cert. denied, 524 U.S. 951, 118 S.Ct. 2367, 141 L.Ed.2d 736 (1998). See, e.g., Hague v. CIO, 307 U.S. 496, 515-16, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (streets and parks); Frisby, 487 U.S. at 480-81, 108 S.Ct. 2495 (city and residential streets); United States v. Grace, 461 U.S. 171, 179-80, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (sidewalks surrounding the Supreme Court); Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 757-58, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (plaza surrounding state capitol).
 
 
 22
 Content-based restrictions on speech in traditional public fora are subject to strict scrutiny. See Perry, 460 U.S. at 45, 103 S.Ct. 948. Such restrictions must serve a compelling government interest and be narrowly tailored to achieve that interest. See id. The government may, however, impose content-neutral time, place and manner restrictions on speech in a traditional public forum so long as those restrictions are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communications." Id.
 
 
 23
 The second category of government-owned fora is the "designated" public forum, which is a non-public forum that the government has opened for all types of expressive activity. See Cornelius, 473 U.S. at 802, 105 S.Ct. 3439. As is the case with traditional public fora, restrictions on speech in designated public fora are constitutional only if they are content-neutral time, place, and manner restrictions that are (1) "necessary to serve a compelling state interest" and (2) "narrowly drawn to achieve that interest." Id. at 800, 105 S.Ct. 3439.
 
 
 24
 A subset of the designated public forum, the "limited" public forum, exists "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." N.Y. Magazine, 136 F.3d at 128 n. 2 (internal quotation marks omitted). A limited public forum is created only where the government "makes its property generally available to a certain class of speakers," as opposed to reserving eligibility to select individuals who must first obtain permission to gain access. Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). Examples of limited public fora include state university meeting facilities opened for student groups, see Widmar v. Vincent, 454 U.S. 263, 267, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), open school board meetings, see City of Madison Joint Sch. Dist. No. 8 v. Wis. Employment Relations Comm'n, 429 U.S. 167, 174-76, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976), city-leased theaters, see South-eastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 555-56, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), and subway platforms opened to charitable solicitations, see Young v. N.Y.C. Transit Auth., 903 F.2d 146, 161-62 (2d Cir.), cert. denied, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990).
 
 
 25
 In limited public fora, strict scrutiny is accorded only to restrictions on speech that falls within the designated category for which the forum has been opened. See Travis v. Owego-Apalachin Sch. Dist., 927 F.2d 688, 692 (2d Cir.1991); Fighting Finest, Inc. v. Bratton, 95 F.3d 224, 229 (2d Cir.1996). "Thus, in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre." Travis, 927 F.2d at 692. As to expressive uses not falling within the limited category for which the forum has been opened, restrictions need only be viewpoint neutral and reasonable. See N.Y. Magazine, 136 F.3d at 128 n. 2; Gen. Media, 131 F.3d at 278 n. 6; Deeper Life Christian Fellowship, Inc. v. Bd. of Educ., 852 F.2d 676, 679-80 (2d Cir.1988).
 
 
 26
 The third category consists of all remaining public property, that is, property that the government has not opened for expressive activity by members of the public. See Lee, 505 U.S. at 678-79, 112 S.Ct. 2701. The government may restrict speech in non-public fora subject only to the requirements of reasonableness and viewpoint neutrality. See Cornelius, 473 U.S. at 800, 105 S.Ct. 3439; N.Y. Magazine, 136 F.3d at 128. Examples of non-public fora include airport terminals, see Lee, 505 U.S. at 685, 112 S.Ct. 2711, military bases and restricted access military stores, see Greer v. Spock, 424 U.S. 828, 838, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); Gen. Media, 131 F.3d at 280, jailhouse grounds, see Adderley v. State of Florida, 385 U.S. 39, 45, 47-48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), and the Meadowlands Sports Complex, see Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth., 691 F.2d 155, 161 (3d Cir.1982).
 
 
 27
 The public forum doctrine raises particular challenges in a case such as this, where the plaintiff seeks to classify as a "traditional public forum" a public place that does not easily meet the historic definition of such a forum.[8] Nevertheless, in applying the public forum doctrine to the facts of this case, we do not view the tripartite approach as a straightjacket, but instead as a useful means of analyzing the parties' competing interests, informed by such factors as the location, use, and purpose of the property in question. Indeed, while it has been observed that traditional public fora are not expressly designed to accommodate all forms of speech, see Lee, 505 U.S. at 696, 112 S.Ct. 2711 (Kennedy, J., concurring in judgment), common to those types of properties deemed to be traditional public fora is that "the open access and viewpoint neutrality commanded by the [public forum] doctrine is compatible with the intended purpose of the property." Forbes, 523 U.S. at 673, 118 S.Ct. 1633 (internal quotation marks omitted); see also Lee, 505 U.S. at 698, 112 S.Ct. 2711 (Kennedy, J., concurring in judgment) (stating that a traditional public forum exists if "the objective, physical characteristics of the property at issue and the actual public access and uses that have been permitted by the government indicate that expressive activity would be appropriate and compatible with those uses"). Accordingly, in addressing the Union's argument that the Plaza is a traditional public forum, we will inquire not only whether the Plaza falls within those categories of property historically deemed to be traditional public fora, but also whether it is the type of property that should be so classified given its physical characteristics, the objective ways in which it is used, and the City's intent in constructing and opening it to the public. See, e.g., Kokinda, 497 U.S. at 727, 110 S.Ct. 3115.
 
 
 28
 B. Is the Plaza a Public Forum?
 
 
 29
 In order to assess the constitutionality of Lincoln Center, Inc.'s policy limiting expressive uses in the Plaza to those having a "performance, entertainment or other artistic component" — which resulted in a rejection of the Union's proposed rally and leafletting activities — we must first determine the Plaza's proper forum categorization. No court has assessed the permissibility of speech restrictions on property with a structure and use similar to the Plaza. Compare Hawkins v. City & County of Denver, 170 F.3d 1281, 1287-88 (10th Cir.) (enclosed plaza forecourt located in a performing arts center is a non-public forum), cert. denied, 528 U.S. 871, 120 S.Ct. 172, 145 L.Ed.2d 145 (1999), with Congregation Lubavitch v. City of Cincinnati, 923 F.2d 458, 461-62 (6th Cir.1991); 997 F.2d 1160, 1161 (6th Cir.1993) (landscaped fountain plaza in downtown Cincinnati opened to all forms of public expression is "probably" a traditional public forum). Thus, we embark in uncharted waters.
 
 
 30
 The Union does not contend that the City has deliberately thrown open the Plaza for all forms of expressive use by the public. Rather, the Union argues that the Plaza is a traditional public forum because it is either a public park or a public place that is functionally equivalent to a park, sidewalk, or public thoroughfare. The defendants assert that the Plaza is a non-public forum, or at most a limited public forum, because the Plaza's main purpose is to serve as the "forecourt" for the performing arts halls at Lincoln Center, and, unlike a park or public thoroughfare, the Plaza has not traditionally served as a forum for debate or assembly.
 
 
 31
 In distinguishing between a public and non-public forum, we examine the forum's physical characteristics and the context of the property's use, including its location and purpose. See, e.g., Kokinda, 497 U.S. at 727-29, 110 S.Ct. 3115; Grace, 461 U.S. at 179-80, 103 S.Ct. 1702. "The primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used." N.J. Sports, 691 F.2d at 160. Also relevant is the government's intent in constructing the space and its need for controlling expressive activity on the property, as evidenced by its policies or regulations. See, e.g., Greer, 424 U.S. at 837-38, 96 S.Ct. 1211; Paulsen v. County of Nassau, 925 F.2d 65, 69 (2d Cir.1991) (government intent must be inferred from "policy and past practice, as well as the nature of the property and its compatibility with expressive activity"); N.J. Sports, 691 F.2d at 160-61 ("Public forum status is not appropriate for a locale where the full exercise of First Amendment rights would be inconsistent with the special interests of a government in overseeing the use of its property." (internal quotation marks omitted)). Finally, we consider whether the property in question "is part of a class of property which by history or tradition has been open and used for expressive activity." Warren v. Fairfax County, 196 F.3d 186, 190 (4th Cir.1999); see also Greer, 424 U.S. at 838, 96 S.Ct. 1211; Venetian Casino Resort, L.L.C. v. Local Joint Exec. Bd., 257 F.3d 937, 943 (9th Cir.2001), cert. denied, 535 U.S. 905, 122 S.Ct. 1204, 152 L.Ed.2d 142 (2002).
 
 
 32
 The Union argues first that the Plaza has been expressly designated by the city as a public park.[9] See Gewirtz v. City of Long Beach, 69 Misc.2d 763, 330 N.Y.S.2d 495, 505 (N.Y.Sup.1972) (a municipality can "dedicate property to public use"), aff'd, 45 A.D.2d 841, 358 N.Y.S.2d 957 (2d Dep't 1974). Assuming this is so, the Union reasons, the Plaza would automatically warrant traditional public forum status. See, e.g., N.J. Sports, 691 F.2d at 160 ("Streets, parks and sidewalks are the paradigms of a public forum ...."); cf. Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 814, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (noting that public streets and parks enjoy "a traditional right of access"). We express no opinion on whether a dedicated public park must necessarily qualify as a traditional public forum, without regard to the context of its location and use.[10] We conclude, however, that while there is no dispute that the Plaza is a public place or that it is owned by the City and falls within the jurisdiction of the Parks Department, the Union has not established that the Plaza has been designated as a public park by the city.
 
 
 33
 "[A] parcel of property may become a park by express provisions in a deed or legislative enactment or by implied acts, such as the continued use of the parcel as a park." Angiolillo v. Town of Greenburgh, 290 A.D.2d 1, 735 N.Y.S.2d 66, 73 (2d Dep't 2001); see also Ackerman v. Steisel, 104 A.D.2d 940, 480 N.Y.S.2d 556, 558 (2d Dep't 1984), aff'd, 66 N.Y.2d 833, 498 N.Y.S.2d 364, 489 N.E.2d 251 (1985); Gewirtz, 330 N.Y.S.2d at 504-05. The Union presented no evidence to the District Court that the Plaza's conveyance documents expressly limit the Plaza property to park uses or that the Plaza has been dedicated as a public park by legislative act. It is true, however, that absent a formal dedication, an implied dedication of park land may exist "when a municipality's acts and declarations manifest a present, fixed, and unequivocal intent to dedicate." Riverview Partners, L.P. v. City of Peekskill, 273 A.D.2d 455, 710 N.Y.S.2d 601, 602 (2d Dep't 2000).
 
 
 34
 The only official act to which the Union points is Section 18-116 of the New York City Code, which authorized the City to construct a parking garage "under the public park property in Lincoln Square Performing Arts Center for the purpose of accommodating persons using the facilities included in the Performing Arts Center and the adjacent public parks." N.Y.C.Code § 18-116. The reference to "public park property" is inconclusive, however, because the garage lies underneath Damrosch Park, a city park, as well as the Plaza.
 
 
 35
 While Lincoln Center, Inc. does not dispute that the Plaza is under the jurisdiction of the Parks Department and is defined as a "park" in the Parks Department's Rules & Regulations, the Parks Department has jurisdiction over all "parks, squares, public places, playgrounds and other recreational properties" in the city. N.Y.C. Charter § 533. Moreover, its Rules and Regulations define "park" as "public parks, beaches, waters and land under water, pools, boardwalks, playgrounds, recreation centers and all other property ... under the jurisdiction ... of the Department." City of New York Parks & Recreation, Rules and Regulations § 102 (August 1998). The Union also requests that we take judicial notice of the fact that the Parks Department website lists the Plaza under a menu entitled "Your Park." While it may be appropriate to take notice of the fact that the website makes such a designation, as the authenticity of the site has not been questioned, see, e.g., Ligon v. Doherty, 208 F. Supp.2d 384, 386 (E.D.N.Y. 2002); Hendrickson v. Ebay, Inc., 165 F.Supp.2d 1082, 1084 n. 2 (C.D.Cal. 2001), the fact itself has little relevance with regard to park dedication. The website refers to various types of properties as "parks" under this menu, including gardens and school playgrounds.
 
 
 36
 Thus, the Union's "circumstantial" evidence of implied park dedication is insufficient to raise a question of fact as to whether the City has dedicated the Plaza as a city park.[11] Moreover, whatever label is used, the City has affirmatively demonstrated an intent not to treat the Plaza as it would a typical city park. For example, the Parks Department retains exclusive scheduling authority over neighboring Damrosch and Dante Parks and permits organized expression in those parks. In contrast, Lincoln Center, Inc., as the City's licensee, has limited organized public speech in the Plaza to events having an artistic or performance-related component.
 
 
 37
 Having determined that the Plaza has not been dedicated, expressly or impliedly, as a city park, we next address the Union's argument that the Plaza is a public place that is a hybrid of a park, sidewalk, and public thoroughfare and therefore is deserving of traditional public forum status. As described above, the Plaza is an open square situated at the center of several performing arts buildings in the Lincoln Center complex — Avery Fisher Hall to the north, the Opera House to the west, and the New York State Theater to the south. The Plaza opens east onto Columbus Avenue and is reached by climbing a flight of stairs. The Plaza can also be accessed by pedestrian walkways that lead from the surrounding streets past the arts buildings. The Plaza is paved with cement and features its signature fountain at the center. Limited public seating is available at the west end of the Plaza and around the fountain itself. Damrosch Park lies immediately to the southwest, and the North Plaza and a reflecting pool immediately to the northwest. See generally Young, Lincoln Center, at 140-41, 183, 250, 261; Appendix.
 
 
 38
 To support its argument that the Plaza should be treated as a traditional public forum, the Union cites Heffron v. International Society for Krishna Consciousness, Inc., 452 U.S. 640, 651, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981), for the proposition that a traditional public forum is a place that is "continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment." Id.; see also United States v. Kokinda, 497 U.S. 720, 727, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). The Union points to evidence that the Plaza is visited and used by members of the public who are not attending events at Lincoln Center, and that the Plaza was designed as an open, public space connected to the city's "major thoroughfares." Lincoln Center, Inc. does not dispute that non-patrons use the Plaza for the purpose of traversing between surrounding streets, or that non-patrons visit the Plaza in order to read or eat lunch by the fountain or simply to take in the sun.
 
 
 39
 The observation that the Plaza is used in ways similar to a public park or thoroughfare, however, does not end the inquiry. Rather, we must also examine the Plaza's "location" and "purpose." Kokinda, 497 U.S. at 728-29, 110 S.Ct. 3115; see also id. at 727, 110 S.Ct. 3115 ("The mere physical characteristics of the property cannot dictate forum analysis."). Several features of the Plaza suggest that it is dissimilar to those types of properties that have historically been defined as traditional public fora, i.e., parks, sidewalks, and streets, and further suggest that permitting all forms of expression would be inconsistent with its primary function and purpose.
 
 
 40
 First, the Plaza's location indicates that its primary architectural function is to serve as the centerpiece for the Lincoln Center performing arts complex. As such, the Plaza is an aesthetically pleasing landmark and a community symbol of the arts, as well as a gathering place for those attending performances at Lincoln Center. Thus, although Lincoln Center was designed to be "related to the city," rather than "isolated" from it, Young, Lincoln Center, at 80, and the Plaza itself was designed to "remain[] open to Columbus Avenue," id. at 140, the Plaza's physical location distinguishes it from a typical recreational park or town square. Similarly, although the Plaza connects with walkways leading to surrounding streets, it does not form part of the City's transportation grid in the way that traditional streets and sidewalks do. The ability of pedestrians to cross the Plaza as a short-cut between surrounding streets is merely an incidental feature of its principal function as the entrance plaza for the Lincoln Center complex. Moreover, as a result of the Plaza's physical location at the center of the surrounding performing arts buildings, pedestrians visiting the Plaza likely understand that they "have entered some special type of enclave." United States v. Grace, 461 U.S. 171, 180, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); cf. Venetian Casino Resort, L.L.C. v. Local Joint Exec. Bd., 257 F.3d 937, 945 (9th Cir.2001) (describing pedestrians' inability to discern that a public sidewalk had encroached onto private property), cert. denied, 535 U.S. 905, 122 S.Ct. 1204, 152 L.Ed.2d 142 (2002); Freedom From Religion Found., Inc. v. City of Marshfield, 203 F.3d 487, 494-95 (7th Cir.2000) (noting that no visual boundaries separated privately owned park property from adjacent public park land).
 
 
 41
 Furthermore, the City participated in the creation of the Lincoln Center complex for the purpose of establishing a cultural center devoted to the performing arts, and Lincoln Center, Inc. has sought to limit organized speech in the Plaza to arts- and performance-related events. Thus, despite the fact that the Plaza's design encourages passers-by to enter and pass through the Plaza, by restricting organized expression to arts-related presentations, the City has evidenced an intent to conserve the Plaza's function as an extension of the performing arts complex.[12] Worth noting again in this regard is that neighboring Damrosch and Dante Parks are open to other expressive uses, further indicating that the Plaza, by contrast, is intended to serve a more limited function. See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 680, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) ("[S]eparation from acknowledged public areas may serve to indicate that the separated property is a special enclave, subject to greater restriction."). Finally, plazas that serve as forecourts in performing arts complexes are not the types of public spaces that have traditionally been dedicated to expressive uses, or in which the government's ability to restrict speech has historically been circumscribed. See Hawkins v. City & County of Denver, 170 F.3d 1281, 1287-88 (10th Cir.) (holding that an enclosed forecourt to a performing arts center is a non-public forum), cert. denied, 528 U.S. 871, 120 S.Ct. 172, 145 L.Ed.2d 145 (1999).
 
 
 42
 Thus, it is apparent that the Plaza's primary function and purpose is to serve as a pleasing forecourt at the center of a prominent performing arts complex, to facilitate patrons' passage into the events taking place in the arts buildings, and symbolically to promote the cultural arts for the benefit of the community. Although the Plaza's design clearly invites passers-by to stroll through or linger, the Plaza was not created primarily to operate as a public artery, nor to provide an open forum for all forms of public expression. Cf. First Unitarian Church v. Salt Lake City Corp., 308 F.3d 1114, 1125-27 (10th Cir.2002) (holding that a portion of Main Street sold to church and converted into pedestrian plaza is a traditional public forum because by retaining easement for public passage, city intended to "encourage pedestrian traffic" and to "preserve and enhance the [downtown] pedestrian grid"). Put another way, the Plaza has not "traditionally been available for public expression," Lee, 505 U.S. at 678, 112 S.Ct. 2701, nor does it have as a "principal purpose ... the free exchange of ideas." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); cf. Hawkins, 170 F.3d at 1287-88 (enclosed forecourt in performing arts center is a non-public forum); Chicago Acorn v. Metro. Pier & Exposition Auth., 150 F.3d 695, 702-03 (7th Cir.1998) (sidewalks, plaza, and amusement park located on Navy Pier are non-public fora). Moreover, because the Plaza is not surrounded by government buildings, it is easily distinguished from those plazas and squares in which political speech has historically been protected. See, e.g., Warren v. Fairfax County, 196 F.3d 186, 189-90 (4th Cir.1999) (en banc) (park-like mall on grounds of legislative buildings is a traditional public forum).
 
 
 43
 Consideration of the relevant factors, i.e., the Plaza's location, use, function, and purpose, together with the City's intent in building the space, demonstrates that permitting all forms of expressive activity in the Plaza would be incompatible with its "intended purpose," Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 673, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (internal quotation marks omitted), and "how the locale is used." Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth., 691 F.2d 155, 160 (3d Cir.1982). Moreover, the City has a strong interest in preserving the Plaza for its intended function. Indeed, it is self-evident that permitting speech on all manner of public issues in the Plaza would compromise the City's ability to establish a specialized space devoted to contemplation and celebration of the arts. Accordingly, we reject the Union's argument that the Plaza should be accorded the same level of constitutional protection as would a traditional public forum.
 
 
 44
 Even though the Plaza is not a traditional public forum, by allowing expression of an artistic or performance-related nature in the Plaza, it may be argued that the City has created a limited public forum. Indeed, that is the conclusion reached by both District Judges in the proceedings below.
 
 
 45
 In general, a limited public forum is created when the government opens a non-public forum for public expression, but limits expressive activity to certain kinds of speakers or the discussion of particular subjects. See Travis v. Owego-Apalachin Sch. Dist., 927 F.2d 688, 692 (2d Cir.1991). However, as the Supreme Court has noted, "[a] [limit]ed public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers." Forbes, 523 U.S. at 679, 118 S.Ct. 1633; see also Fighting Finest, Inc. v. Bratton, 95 F.3d 224, 230 (2d Cir.1996) (holding that, in analyzing whether a limited public forum has been created, we consider "the nature of the property or means of communication, the Government's purpose in permitting whatever limited access it has allowed, and the conditions of access (e.g., whether permission is required)").
 
 
 46
 There is scant evidence in the record describing the conditions of access to the Plaza, making difficult any determination of whether the Plaza is generally available to members of the public for organized artistic expression or whether access is restricted to select individuals. On the one hand, Lincoln Center, Inc. concedes that it authorizes gatherings in the Plaza for the purpose of expression through "performance, entertainment, or other artistic [means]," and the parties' License Agreement contains detailed provisions governing Lincoln Center, Inc.'s authority to schedule such events. On the other hand, the Director of Community Programming for Lincoln Center, Inc. attests that "[e]ven within the category of events for which we do grant permission, namely events having a performance, entertainment, or artistic component, we exercise judgment and discretion and deny requests to use the Plaza for activities that in our judgment are not of a suitable artistic quality." While this statement is uncontested, it is also unsupported by any factual detail that would further elucidate the degree of selectivity exercised by Lincoln Center, Inc.
 
 
 47
 Due to the lack of clarity in the record on this point, we leave for another day a more definite resolution of the Plaza's status as either a limited public forum or a non-public forum. The distinction is immaterial in this case, because the Union's proposed activities fall outside the class of expressive uses for which the Plaza has been opened. The Union was seeking to leaflet and host an organizational rally, not stage an artistic performance, and government restrictions on expressive uses not falling within the limited category for which a limited public forum has been opened are subject to the same level of scrutiny as restrictions in non-public fora. See infra.
 
 C. Constitutionality of Restrictions
 
 48
 The Union challenges Lincoln Center, Inc.'s policy prohibiting political speech in the Plaza both facially and as applied to Lincoln Center, Inc.'s denial of the Union's application to stage a rally in the Plaza and its refusal to permit a Union member to leaflet in the Plaza.
 
 
 49
 Content-based exclusions of speech in a non-public forum need only be viewpoint neutral and reasonable in relation to the forum's purpose. See N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 128 (2d Cir.), cert. denied, 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998). Similarly, in a limited public forum, the government is permitted to make content-based exclusions of speech that do not fall within the category of uses to which the forum has been opened, so long as those exclusions satisfy the viewpoint-neutral and reasonableness criteria. See Bratton, 95 F.3d at 229. Thus, whether the Plaza is deemed a non-public forum or a limited public forum, the defendants' policy restricting the public's organized use of the Plaza to events "having a performance, entertainment or other artistic component," though content-based, is permissible so long as it meets these constitutional criteria.
 
 
 50
 We conclude, as an initial matter, that the policy of limiting expressive uses in the Plaza to those that are artistic or performance-related is viewpoint neutral on its face and as applied to the Union's proposed activities, as there is no claim on appeal that Lincoln Center, Inc. discriminated against the Union based on viewpoint when it denied its application to stage a rally or prevented it from leafletting.
 
 
 51
 Furthermore, we conclude that Lincoln Center, Inc.'s refusal to permit political and labor-related rallies, demonstrations, and leafletting in the Plaza, and its denial of the Union's request to do the same, is reasonable. "The reasonableness of the Government's restriction ... must be assessed in light of the purpose of the forum and all the surrounding circumstances," Cornelius, 473 U.S. at 809, 105 S.Ct. 3439, and must be "consistent with the [government's] legitimate interest in preserving the property for the use to which it is lawfully dedicated." Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 50-51, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (internal quotation marks and alterations omitted). "`Consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved.'" Lee, 505 U.S. at 687, 112 S.Ct. 2711 (O'Connor, J., concurring) (quoting United States v. Kokinda, 497 U.S. 720, 732, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990)). Accordingly, in examining the compatibility between the prohibited speech and the particular forum, we ask whether the restrictions on speech are "reasonably related" to maintaining the environment that the government has deliberately created. Id. at 689, 112 S.Ct. 2711.
 
 
 52
 Lincoln Center, Inc.'s policy allowing only arts-related expression is consistent with the objective purpose and public use of the Plaza. The Lincoln Center complex was created as an enclave for the cultural arts. As such, Lincoln Center, Inc.'s policy as applied to the Plaza, the architectural centerpiece of the complex, reasonably furthers the City's intentions in opening this space to the public for particular uses. Indeed, permitting events of a performance-related nature serves an important public purpose in promoting the arts and establishing a community space for the public to experience artistic performances. Moreover, while the Plaza's design invites pedestrians to visit and pass through, its use by the public is also limited by the Plaza's physical location and function as a paved forecourt connecting the various arts buildings in the complex.
 
 
 53
 Accordingly, restricting organized public expression in the manner in which Lincoln Center, Inc. has chosen is reasonable notwithstanding the Plaza's open design. Moreover, although the defendants did not make a specific showing below with regard to the nature and extent of the disruption that rallies and picketing would cause, the fact that permitting such activities on any variety of topics would interfere with the City's mission in establishing this specialized space "ring[s] of commonsense." Id. at 690, 112 S.Ct. 2701 (internal quotation marks and alterations omitted); cf. also Hawkins, 170 F.3d at 1291 (picketing and leafletting in forecourt of performing arts complex at performance time "could seriously disrupt" its "limited purpose as an entertainment venue"). While the impact of rallies and demonstrations in the Plaza could be lessened by time, place, and manner restrictions, a government limitation on access to a limited or non-public forum need only be reasonable, not "the most reasonable or the only reasonable limitation." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 808, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); see also United States v. Kokinda, 497 U.S. 720, 730, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990).
 
 
 54
 With regard to the Union's as-applied challenge, in May 1999, the Union requested a permit to stage a "labor rally" in the Plaza in support of opera concession workers whom the Union was seeking to represent. The proposed rally was to consist of approximately forty people positioned behind barricades, and was to include both picketing and leafletting. Lincoln Center, Inc. denied the Union's request, consistent with its policy disallowing political rallies and demonstrations in the Plaza, and the Union makes no claim on appeal that Lincoln Center, Inc. engaged in selective enforcement when it did so. Therefore, because the defendants' actions were consistent with its policy, which we have concluded comports with governing constitutional principles, we reject the Union's as-applied challenge to the proposed rally.
 
 
 55
 The Union's challenge to Lincoln Center, Inc.'s policy prohibiting leafletting in the Plaza raises a closer question, as leafletting by its nature is less disruptive than other forms of expression. See Lee, 505 U.S. at 690, 112 S.Ct. 2711 (O'Connor, J., concurring) ("[O]ne need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand ...." (internal quotation marks omitted)). We have noted on a prior occasion that "[f]rom the time of the founding of our nation, the distribution of written material has been an essential weapon in the defense of liberty.... Today, ... the handbill remains important to the promise of full and free discussion of public issues." Paulsen v. County of Nassau, 925 F.2d 65, 66 (2d Cir.1991). In Paulsen, we struck down a ban on leafletting on the grounds of the Nassau County Veterans Memorial Coliseum, a designated public forum, in part because "distributing handbills ... is not likely ... to interfere with the mood or the quality of the Coliseum arena events." Id. at 71. In examining the compatibility between expressive activity and the Coliseum grounds, we noted that the Coliseum's premises "are frequently the site of boisterous recreational activity" and "can comfortably accommodate a wide variety of expressive activities ...." Id. at 70; see also Wolin v. Port of N.Y. Auth., 392 F.2d 83, 89, 92 (2d Cir.) (rejecting leafletting ban in Port Authority Bus Terminal, "a thoroughfare used by thousands of people each day"), cert. denied, 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968); Chicago Acorn v. Metro. Pier & Exposition Auth., 150 F.3d 695, 703 (7th Cir.1998) (rejecting leafletting ban on outdoor sidewalks, open areas, and indoor mall of Navy Pier).
 
 
 56
 Similarly, in International Society for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), the Supreme Court struck down a ban on leafletting in airport terminals. In her controlling opinion, Justice O'Connor agreed that the terminals were non-public fora, but noted that in opening the airport terminals in question, the government had "created a huge complex open to travelers and nontravelers alike. The airports house restaurants, cafeterias, snack bars, coffee shops, cocktail lounges, post offices, banks, [etc.]." Id. at 688, 112 S.Ct. 2711. Thus, the government had essentially opened a "shopping mall as well as an airport," from which it followed that banning the distribution of leaflets was not "reasonably related to maintaining the multipurpose environment" that the government had created. Id. at 689, 112 S.Ct. 2711.
 
 
 57
 Both this Court in Paulsen and Justice O'Connor in Lee focused on the compatibility between the expressive activity in question and the objective nature of the property, together with the government's legitimate interest in restricting that activity in light of the purpose and function of the property. In applying these holdings to the present case, we note that the Plaza is far different from the "boisterous" grounds of Nassau Coliseum or the mall-like environment of airport terminals. Instead, the City has created a fountain plaza that serves as the centerpiece of a prominent performing arts complex, and it has sought to preserve the Plaza as an area singularly dedicated to Lincoln Center events and other artistic performances. As such, the "special attributes" of the Plaza distinguish it from the fora in Paulsen and Lee, and suggest that prohibiting leafletting is not an unreasonable restriction in light of the Plaza's particular and limited function and purpose. This is especially so where neighboring Damrosch and Dante Parks, and the public sidewalks surrounding Lincoln Center, provide ample alternative venues for groups such as the Union who wish to voice their views to Lincoln Center's patrons. See Cornelius, 473 U.S. at 809, 105 S.Ct. 3439 (finding a regulation reasonable where "speakers have access to alternative channels" through which they can reach their intended audience). Accordingly, we conclude that Lincoln Center, Inc.'s policy prohibiting leafletting also passes constitutional muster.
 
 CONCLUSION
 
 58
 In conclusion, we hold that the Plaza is not a traditional public forum. We further hold that the defendants' policy limiting organized public expression in the Plaza to artistic and performance-related events is viewpoint neutral and reasonable in relation to the forum's function and purpose. Accordingly, the judgment of the District Court is AFFIRMED. NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 Notes:
 
 
 [1]
 The parties request that we take judicial notice of the facts contained in Edgar B. Young's comprehensive history of the construction of Lincoln Center. Although the parties make this request for the first time on appeal, "[j]udicial notice may be taken at any stage of the proceeding." Fed.R.Evid. 201(f). Under Fed.R.Evid. 201(b)(2), "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." We agree that the descriptions and history of Lincoln Center set forth in Young's authoritative text are an appropriate candidate for judicial noticeCf. Flood v. Kuhn, 407 U.S. 258, 260-62, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972) (taking judicial notice of various authoritative books on baseball); Oneida Indian Nation of N.Y. v. State of N.Y., 691 F.2d 1070, 1086 (2d Cir.1982) ("When there is no dispute as to the authenticity of [] materials and judicial notice is limited to ... factual matters that are incontrovertible, such notice is admissible.").
 
 
 [2]
 The "public areas" managed by Lincoln Center, Inc. include the Plaza, Damrosch Park, the North Plaza, the sidewalks and steps adjacent to Columbus Avenue, and various pedestrian walkways and vehicular tunnels
 
 
 [3]
 We have previously considered an unrelated First Amendment challenge to an injunction imposed upon the Union in the context of a dispute with the Metropolitan OperaSee Metro. Opera Ass'n, Inc. v. Local 100, 239 F.3d 172 (2d Cir.2001).
 
 
 [4]
 According to Jenneth Webster, Director of Community Programming for Lincoln Center, Inc., "[o]n the occasions when an applicant for permission to use the Plaza does not realize that the Plaza is under Lincoln Center's control and sends a request for permission to the [Parks] Department, the Department forwards to Lincoln Center all applications it receives for use of the Plaza."
 
 
 [5]
 The Union also sought a permit from the Parks Department to hold a rally in Damrosch Park, which the Parks Department denied allegedly because the rally would be too loud and would disrupt pedestrian traffic. The Union does not challenge that denial in this suit
 
 
 [6]
 Judge McKenna declined to reach the issue of whether "the Plaza is a non-public forum by reason of the City's license to Lincoln Center."
 
 
 [7]
 On appeal, the Union no longer presses any argument that Lincoln Center, Inc.'s policy has been applied inconsistently, nor does it claim that the District Court erred in its analysis of the newspaper articles. The Union submitted no evidence of such rallies or picketing after 1990
 
 
 [8]
 We note that the public forum doctrine has been criticized by someSee, e.g., Robert C. Post, Between Governance & Management: The History & Theory of the Public Forum, 34 U.C.L.A. L. REV. 1713 (1987); Steven G. Gey, ReOpening the Public Forum: From Sidewalks to Cyberspace, 58 OHIO ST. L.J. 1535 (1998); Laurence H. Tribe, American Constitutional Law § 12-24 (2d ed. 1988). Yet, this thirty-year-old doctrine developed by the Supreme Court for the analysis of speech restrictions on public property retains its full vitality.
 
 
 [9]
 Although the Union advanced the argument that the Plaza is a city park in its briefs, that theory was de-emphasized at oral argument. While counsel for the Union did not explicitly concede that the Plaza is not a park, we understand his emphasis to be that it is a "thoroughfare," a "hybrid of a public square and a sidewalk," an "unrestricted area for public open-air recreation," and a "public place." Tr. 11/17/02 Arg. at 6, 8. We nevertheless address the argument that the Plaza is a city park in the interest of completeness
 
 
 [10]
 The Union's argument is based in part on the proposition that in New York, dedicated park land is inalienable and held in trust for the publicSee Angiolillo v. Town of Greenburgh, 290 A.D.2d 1, 735 N.Y.S.2d 66, 73 (2d Dep't 2001); N.Y.C. Charter § 383. But, the mere fact of inalienability does not eviscerate the requirement that, in order to qualify as a traditional public forum, a parcel of property must have "traditionally been available for public expression." Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). We note also that the Supreme Court has never specifically defined a "park" for purposes of public forum analysis. Webster's defines "park" as a "tract of land maintained by a city or town as a place of beauty or of public recreation." Webster's Third New Int'l Dictionary 1642 (1993).
 
 
 [11]
 The Union also points to a document contained in Lincoln Center, Inc.'s files, dated November 8, 1985 and entitled "Plaza Policy & Usage Guidelines Revised Draft." The relevant section reads: "The Plaza and outdoor areas of Lincoln Center are public properties and under the control of the New York City Parks and Police Departments. Lincoln Center, Inc. has a custodial role in scheduling, securing and maintaining these grounds, but must operate the facilities within the same legal parameters as any other park property. The plazas and public areas were designed as parks and pedestrian thoroughfares." Lincoln Center, Inc. counters that the document was never adopted as formal policy. Even assuming this document were admissible as a party admission, Lincoln Center, Inc.'s own fleeting reference to the outdoor areas as "park property" is of limited relevance, particularly given the fact that it is not disputed that those areas fall within the jurisdiction of the Parks Department. Similarly, its description of the design of the public areas at Lincoln Center is just that — a description, not a legal conclusion
 
 
 [12]
 In focusing on the City's intent in constructing and regulating speech in the Plaza, we are cognizant of the principle that a traditional public forum is "open for expressive activity regardless of the government's intent."Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 678, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998); see also Grace, 461 U.S. at 180, 103 S.Ct. 1702 ("[G]overnment [cannot] transform the character of a [traditional public forum] by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property."); Henderson v. Lujan, 964 F.2d 1179, 1183 (D.C. Cir.1992) ("[G]overnment cannot establish the inconsistency [between expression and the property at issue] simply by declaring it and by enforcing restrictions on speech ... ; [nor can] time, place, or manner restrictions ... bootstrap themselves into validity by their mere existence, even if prolonged."). Relying on this proposition, the Union reasons that the City should not be permitted to transform the Plaza into a non-public forum simply by declaring a policy that limits expressive use to arts-related events. We note that courts that have rejected government intent as a justification for speech restrictions do so under a theory that the government may not alter by fiat what is indisputably a traditional public forum. See, e.g., Grace, 461 U.S. at 180, 103 S.Ct. 1702 (sidewalks surrounding Supreme Court); Henderson, 964 F.2d at 1182-83 (sidewalks surrounding Vietnam Veterans Memorial); see also Frisby v. Schultz, 487 U.S. 474, 480-81, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (residential streets); Gerritsen v. City of Los Angeles, 994 F.2d 570, 576 (9th Cir.) (merchant's street and sidewalks surrounding consulate), cert. denied, 510 U.S. 915, 114 S.Ct. 306, 126 L.Ed.2d 253 (1993). Similarly, we have held that the government cannot evade strict scrutiny by invoking a policy of limiting expression on property historically opened for expressive activity. See Paulsen v. County of Nassau, 925 F.2d 65, 70 (2d Cir.1991) (holding that the fact that a speech regulation "is now being enforced ... is not enough to convert [the property] into a nonpublic forum"). Here, the Plaza has not historically been open to all types of expression, and while it may share some of the same physical characteristics as sidewalks or parks, its primary function and purpose, together with its historical use, distinguish the Plaza from those types of properties that have heretofore been deemed traditional public fora. See generally Forbes, 523 U.S. at 678, 118 S.Ct. 1633 (indicating that traditional public forum status does not extend beyond its "historic confines"); cf. also Lee, 505 U.S. at 679-81, 112 S.Ct. 2701 (contrasting airport terminals with the characteristics of public fora).