[735 NYS2d 66]

In the Matter of DOMINICK ANGIOLILLO, JR., et al., Respondents-Appellants, v TOWN OF GREENBURGH et al., Respondents, and WBRC CORPORATION et al., Appellants-Respondents. (Appeal No. 1.)

In the Matter of DOMINICK ANGIOLILLO, JR., et al., Appellants, v TOWN OF GREENBURGH et al., Respondents. (Appeal No. 2.)

Second Department, December 3, 2001

### APPEARANCES OF COUNSEL

*Greene & Zinner, P. C.,* White Plains (*Stanley S. Zinner* of counsel), for appellants-respondents in Appeal No. 1 and *WBRC Corporation* and another, respondents in Appeal No. 2.

*Thomas J. Abinanti,* White Plains, for respondents-appellants in Appeal No. 1 and appellants in Appeal No. 2.

*Susan A. Mancuso, Town Attorney,* Elmsford (*Edward M. Lieberman* of counsel), for Town of Greenburgh and another, respondents in Appeal Nos. 1 and 2.

### OPINION OF THE COURT

S. MILLER, J. P.

Among the issues to be decided herein is one that is claimed to have a potentially unsettling impact upon properties developed in accordance with an accepted zoning practice. Does the combination of undeveloped, preexisting, nonconforming building lots require site-plan approval before a home may be built on the resulting conforming lot? In this case, where a developer has combined 15 such nonconforming lots into five buildable conforming lots upon which it seeks to erect, in effect, a five-home subdivision, the answer is clearly yes.

A second issue, one of apparent first impression, is perhaps of greater significance. Notwithstanding the established rule of law prohibiting the alienation of parkland, may excess land taken for the purpose of constructing a parkway be sold without specific legislative approval? Because a parkway is not the same as a park, we hold that such excess parkway property may be sold.

### I

In 1929, the Town of Greenburgh (hereinafter the Town) approved a subdivision map which divided the property known as Orchard Hill into lots that measured 25 feet by 100 feet. The lots that are the subject of this controversy were originally part of that subdivision. In the 1950's, the State of New York acquired a large tract of land in the Town, including the subject lots, for the purpose of constructing the Sprain Brook Parkway. There is no evidence in the record as to how the subject lots were used before, during, or after the construction of the Sprain Brook Parkway.

On January 12, 1999, the New York State Department of Transportation auctioned "surplus property," including the subject unimproved lots on Kathwood Road. The lots were sold

in two parcels, consisting respectively of .457 acres and .687 acres. On June 14, 1999, the Commissioner of Transportation conveyed the two parcels to the WBRC Corporation (hereinafter WBRC) by two quitclaim deeds.

Subsequent to the filing of the original subdivision map in 1929, the Town amended its zoning ordinance by, *inter alia,* increasing the minimum required lot-size for the construction of a single-family home from 2,500 to 7,500 square feet. Thus, when WBRC applied for building permits to construct five single-family homes, it planned to create five conforming lots of 7,500 square feet each by combining three contiguous substandard lots of 2,500 square feet each. In a letter dated November 10, 1999, the Town Attorney advised the Town Building Inspector, John Lucido (hereinafter the Inspector), that the subject property was not dedicated parkland and there was no impediment to issuing building permits. Lucido approved the building permits in late 1999 and early 2000. As soon as WBRC received the building permits, it began clearing trees, excavating the property, and constructing the foundations for the houses.

## II

On March 16, 2000, a group of neighboring homeowners protested the issuance of the building permits by appealing to the Zoning Board of Appeals (hereinafter the ZBA). Additionally, seven homeowners commenced the instant hybrid article 78 proceeding and declaratory judgment action against the Town, the Inspector, and the property owners, WBRC and Baker Roofing (hereinafter collectively the developers, unless otherwise noted). The petitioners sought, among other items of relief, a judgment declaring that the building permits are null and void, a permanent injunction, and a judgment declaring that the property is inalienable parkland which must be restored to its natural condition.

The petitioners asserted that the Inspector issued the building permits in error since the subject property was dedicated parkland which could not be used for residential purposes, the lots were not legally subdivided, the Planning Board had not approved the site plan, and the construction project required SEQRA review. In support of their application for a preliminary injunction, the petitioners noted that they had filed an appeal with the ZBA challenging the issuance of the permits but, "due to a heavy calendar," the ZBA had not yet reached the matter. The petitioners feared that they would be irreparably harmed in the absence of prompt judicial interven-

tion because the developers planned to construct prefabricated houses, which would be completed before the issues could be considered by the ZBA or the court.

In a verified answer dated April 28, 2000, the Town and the Inspector denied that they acted in an arbitrary and capricious manner. In an opposing affidavit, the Inspector claimed that the Town had a long-standing practice of issuing building permits to applicants who combined substandard lots into conforming lots and that the combination of lots did not require subdivision approval as long as the external lot lines coincided with the lot lines on the 1929 subdivision map.

The developers interposed an answer and moved to dismiss the proceeding pursuant to CPLR 7804, arguing, *inter alia,* that the petitioners lacked standing to challenge the building permits, and that the building permits were validly issued.

The Supreme Court initially denied the petitioners' request for a temporary restraining order to give the ZBA the opportunity to rule on the matter in May 2000. However, the developers asked the ZBA for an "as of right adjournment" to its June meeting. In the interim, the Planning Board, upon the ZBA's request, issued an advisory opinion which indicated that the building permits should not have been issued without its prior approval. The Supreme Court thus held a hearing on May 31, 2000, on the petitioners' renewed request for a temporary restraining order, after which the court, *inter alia,* temporarily enjoined the developers from commencing or continuing any work at the site, or selling any of the lots. Although the ZBA heard the appeal regarding the building permits on June 22, 2000, it adjourned the matter to July 13, 2000, without any resolution.

In an order and judgment (one paper) entered July 11, 2000, the Supreme Court denied the developers' application to vacate the temporary restraining order and also denied their motion to dismiss the article 78 proceeding. The Supreme Court determined that the petitioners had standing to challenge the building permits, a matter not contested on appeal, and rejected the exhaustion of administrative remedies arguments. Although the Supreme Court stated that it would have preferred that the ZBA dispose of the appeal before the matter was presented for judicial review, the court noted that the developers had purposely delayed the administrative remedy that the petitioners allegedly failed to exhaust.

Turning to the merits of the petition, the Supreme Court concluded that the subject property was neither acquired nor

dedicated for use as a "park," but rather, for use as a "parkway," and no legislative action was required before the property could be conveyed and used for other purposes. In addition, the Supreme Court determined that the Inspector did not have the authority to issue building permits for newly-drawn lots without the prior approval of the Planning Board. Accordingly, the Supreme Court granted the petition to the extent of declaring that the permits issued by the Inspector to WBRC for the construction of single-family residences on the subject property were "annulled and vacated, *ab initio*." The Supreme Court denied the petitioners' request for a permanent injunction preventing the development of the property and directing that it be restored to its natural condition, with leave to reargue, subject to the developers making an application for relief from the Planning Board.

The developers now appeal from each and every part of the order and judgment, except those portions which, in effect, determined that the property was not a dedicated parkland and denied the petitioners' request for a permanent injunction. The petitioners cross-appeal from so much of the order and judgment as denied their application for a judgment declaring that the subject lots could not be used for any purpose other than a park/parkway without legislative action.

### III

On August 4, 2000, the petitioners moved, in effect, for leave to renew that branch of their petition which was for a judgment declaring that the subject lots were "not available for use other than for 'park and parkway' purposes." In support of the motion, the petitioners' attorney informed the Supreme Court that after its decision became public, he acquired "new evidence" when a community group concerned with the preservation of parkland sent him a copy of the statute that created the Sprain Brook Parkway and Rochambeau Park. Specifically, he noted that chapter 834 of the Laws of 1951 required that the land comprising the parkway shall "forever be reserved and maintained by the state for the use and enjoyment of the public" and that the State shall maintain the right of way "in perpetuity" for "park and parkway purposes and for no other purposes."

In opposition to the motion, the developers asserted, *inter alia,* that the Commissioner of Transportation had the authority to sell those portions of the land that were not used for parkway construction on terms beneficial to the State pursuant to Highway Law § 30 (18) and Transportation Law § 71 (7).

By order entered October 3, 2000, the Supreme Court denied the petitioners' motion on the grounds that, *inter alia,* the 1951 statute did not constitute newly-discovered evidence and the petitioners did not provide reasonable justification for their failure to present the evidence in support of the petition. The Supreme Court also denied the motion of the Town and the Inspector for leave to renew.

Specifically, the Town and the Inspector asked the Supreme Court to modify its earlier determination, which the Inspector interpreted to mean that all previously approved, aggregated lots were illegal, and that he could not issue any building permit for construction on a lot formed by aggregating 25 foot x 100 foot lots unless the owner obtained subdivision approval from the Planning Board. According to the Inspector, it was unfair to apply the Supreme Court's determination to the "innocent owners of previously-approved aggregated lots." In denying the motion, the Supreme Court criticized the Inspector's reading of his determination as "patently erroneous" and "nothing short of astounding." The Supreme Court explained that its declaratory judgment was obviously limited to the five permits at issue and did not apply to previously-approved aggregated lots that had not been challenged.

The petitioners also appeal from so much of the order as denied their motion, in effect, for leave to renew that branch of the petition which sought a judgment declaring that the subject lots may not be used for any purpose other than a park/parkway absent legislative action.

## IV

The primary issue to be determined on appeal is whether the aggregation or combination of three contiguous substandard lots into one conforming lot constitutes a "subdivision" or "re-subdivision" of land within the meaning of the Code of the Town of Greenburgh (hereinafter the Code) and, therefore, requires Planning Board approval before a building permit can be issued. The Supreme Court correctly annulled the permits because *in this case,* subdivision approval was required.

Section 285-44 of the Code provides, in relevant part, that no building permit "shall be issued unless the proposed construction is on a legally subdivided lot," and that any permit issued in violation of that provision "shall be null and void and of no effect." The term "subdivision" is defined in section 250-3 of the Code as "[t]he division of any parcel of land into two or more lots or other divisions of land for the purpose, whether immedi-

ate or future, of transfer of ownership or building development, with or without streets or highways, and in conformity with state law." Significantly, section 250-3 expressly states that the word " '[s]ubdivision' shall include 'resubdivision.' " The term "resubdivision" is defined in section 250-3 as "[a] change of a recorded subdivision plan if any such change affects any street layout shown on such plat or area reserved thereon for public use or any change of a lot line; or any change if it affects any map or plan legally recorded prior to the granting of subdivision review authority to the Planning Board."

It is undisputed that the subdivision plan was legally recorded in 1929, which was before the Planning Board was given subdivision review authority in 1958. According to the developers, however, the *combination* of lots cannot be construed as a *division* of lots from a "definitional standpoint." In addition, they contend that the *combination* of these particular lots did not constitute a "subdivision" or "resubdivision" of land within the meaning of the Code because the *external* lot lines did not change. Neither of these arguments withstands scrutiny because the operative word in the definition of "resubdivision" is *change*—specifically, *"any change of a lot line; or any change if it affects any map or plan"* (emphasis supplied). Here, the combination of substandard lots changed the lot lines and effectively redrew the map that was legally recorded in 1929. Contrary to the reading of the Code posited by the Town and the developers, there is no provision that the only change that requires Planning Board review is a change that affects the external boundaries of the plat.

In rejecting these contentions, the Supreme Court correctly relied on two cases that are directly on point. In *Freundlich v Town Bd.* (73 AD2d 684, *affd* 52 NY2d 921), the Town Planning Board approved a subdivision plan in 1967 that included 24 buildable lots and two roads. In 1972, when the Town amended its zoning ordinance by increasing the minimum lot size, the lots were rendered substandard. Five years later, the new owners drew a "sales map," which combined portions of the old lots and eliminated a road that had been dedicated but not improved. The neighboring property owners commenced an action seeking a declaration that the "sales map" was invalid because it had not been approved by the Town Planning Board. This Court reversed the order dismissing the complaint and declared that the "sales map," which redrew the boundaries of every lot within the plat, constituted a "resubdivision" within the meaning of the Town's code. Notably, this Court expressly

rejected the concept that "resubdivision" applies only "where a new map contains more lots than the original, approved plat." The Court of Appeals agreed that the lot lines on the revised plan were at variance with those on the first subdivision and that the attempted resubdivision was invalid.

Similarly, in *Matter of Bay View Pines Estates v Wines* (204 AD2d 316), the owner of a tract of land, which had been subdivided into 57 lots in the 1940's, planned to combine the 57 lots into 10 lots, each of which would be equal to or exceed the 10,000 square-foot minimum lot area required in the zoning district in which the land was located. This Court held that the fact that the proposed new lots conformed to the present zoning laws did not limit the Planning Board's discretion to consider the validity of building on the lots and that the Planning Board could consider factors other than compliance with the zoning laws in making its determination. In reaching that conclusion, this Court implicitly rejected the dissenting opinion of the late former Justice Balletta, who found that the plan in *Bay View*, which merely combined smaller lots into larger lots and did not change any boundaries or eliminate any streets, was different from the plan in *Freundlich*, and did not require subdivision approval.

In light of these two precedents, the Supreme Court properly annulled and vacated the building permits on the ground that the proposed resubdivision of the subject lots had not been reviewed by the Planning Board.

Both before the Supreme Court, and again on this appeal, the developers and the Inspector have suggested that there is far more at stake here than merely requiring subdivision approval for the few lots presently in controversy. They contend that in light of the previously accepted practice of combining undersized lots to create conforming, buildable lots without subdivision approval, all such combined but unapproved lots are illegal, and thus, in the event of a fire or any other destruction of the existing structures thereon, homeowners will not be able to rebuild without complying with arduous subdivision requirements.

Such claims are speculative, unfounded, and beyond the scope of this appeal. Our holding today merely reaffirms an established rule of law, that a developer may not unilaterally create a subdivision of five neighboring homes, by combining nonconforming lots approved 70 plus years ago, without obtaining subdivision approval from the Planning Board. Whatever may or may not happen to other lots is not before us. We trust,

however, that in the event individual homeowners need or desire to rebuild existing residences, that the relevant Town officials will not impose unreasonable subdivision approval requirements upon individual homeowners who seek only to deal with their individual lots.

## V

A motion for leave to renew must be based on additional material facts, which existed at the time the prior motion was made but "were not then known to the party seeking leave to renew, and, therefore, not made known to the court" (*Foley v Roche,* 68 AD2d 558, 568). It is well settled that a motion for renewal should be denied where the party fails to offer a valid excuse for not submitting the additional information in the original application (*see, Foley v Roche, supra; see also, Matter of Allstate Ins. Co. v Taddeo,* 285 AD2d 503; *Greene v New York City Hous. Auth.,* 283 AD2d 458).

In the present case, the only difference between the petitioners' original claim that the subject lots are inalienable parkland and their motion, in effect, for leave to renew, was the "new evidence" that their attorney received in the form of a 1951 statute. As the Supreme Court aptly noted, however, the 1951 statute did not constitute "new facts" or a "change in the law" nor did the petitioners provide a "reasonable justification" for their failure to present the statute in support of the original petition. In any event, the 1951 statute is not dispositive of the issue.

## VI

■ It is well settled that parkland is inalienable, held in trust for the public, and may not be sold without the express approval of the State Legislature (*see, Friends of Van Cortlandt Park v City of New York,* 95 NY2d 623; *Brooklyn Park Commrs. v Armstrong,* 45 NY 234; *M.S.N.S. Holding Corp. v City of New York,* 253 AD2d 793). The petitioners assert that the subject parcels are such inalienable parkland which could not be sold to the developers without legislative approval. We disagree.

To establish that property has been dedicated for public use, there generally must be an unequivocal express or implied offer by the owner and, where required, an express or implied acceptance by the public (*see, Gewirtz v City of Long Beach,* 69 Misc 2d 763, 770, *affd* 45 AD2d 841). Thus, a parcel of property may become a park by express provisions in a deed or legisla-

tive enactment or by implied acts, such as the continued use of the parcel as a park (*see, Matter of Lazore v Board of Trustees,* 191 AD2d 764, 765). Notably, whether a parcel has become a park by implication is a question of fact which must be determined by such evidence as the owner's acts and declarations and the circumstances surrounding the use of the land (*see, Matter of Lazore, supra,* at 766). The burden of proof rests on the party asserting that the land has been dedicated for public use (*see, Winston v Village of Scarsdale,* 170 AD2d 672, 673).

Here, chapter 834 of the Laws of 1951, which created the Sprain Brook Parkway and Rochambeau Park, provided that the land comprising the parkway shall "forever be reserved and maintained by the state for the use and enjoyment of the public" and that the State shall maintain the right of way "in perpetuity" for "park and parkway purposes and for no other purposes."

As the Supreme Court noted, however, the terms "park" and "parkway" are not synonymous. Although a parkway has some of the characteristics of a park in that it usually includes a median or is bounded by trees, shrubs, grass, and other park-like features, it essentially serves a different purpose, that is for transportation rather than recreation. In other words, a parkway is a thoroughfare for vehicular traffic, little different from any street, highway, thruway, or expressway, except for the added accessory of ornamental landscaping (*see, Kupelian v Andrews,* 233 NY 278). Inasmuch as the subject lots were acquired for the purpose of creating a parkway, they were not expressly dedicated as a park.

Moreover, there is no evidence in the record to support the petitioners' conclusory allegations that the subject property became a park by implication because it has been continuously used for that purpose for more than 50 years. According to the petitioners' liberal definition of a park, the subject property has been used "as an open-space buffer to ease the burden of and compensate the neighborhood for noise and pollution from the parkway." Although the Planning Board may properly consider whether the proposed subdivision will have an adverse impact on the environment, i.e., by eliminating open space or increasing noise and pollution, that does not necessarily mean that the area is a park that cannot be sold without the approval of the New York State Legislature.

The sale of the subject property at public auction in 1999 was authorized by Transportation Law § 71 (7), which gives

the Commissioner of Transportation the authority to dispose of any real property deemed not to be necessary for the operation of special parkways. Moreover, Highway Law § 30 (18) expressly authorizes the Commissioner of Transportation to determine whether any property acquired for highway purposes may be, in whole or in part, "sold or exchanged on terms beneficial to the state, and *in all cases of such determination he may * * * notwithstanding the provisions of any general, special or local law, so dispose of such property*" (Highway Law § 30 [18] [emphasis supplied]).

In light of the obvious import of these statutory provisions, the petitioners have failed to satisfy their burden of proving that there was an express or implied dedication of the subject property as parkland. Moreover, to the extent that the subject property was dedicated for public use as a parkway, the Commissioner of Transportation had the authority to sell it. Thus, the developers are not precluded from building on the subject lots due to the nature of the land as parkland. Rather, whether or not they may build the five-house subdivision they seek to erect is a matter within the authority of the Planning Board and the other relevant municipal agencies, subject to their reasonable exercise of discretion.

Accordingly, the order and judgment entered July 11, 2000, is affirmed insofar as appealed and cross-appealed from, and the order entered October 3, 2000, is affirmed insofar as appealed from.

FRIEDMANN, H. MILLER and SMITH, JJ., concur.

Ordered that the order and judgment entered July 11, 2000, is affirmed insofar as appealed and cross-appealed from, without costs or disbursements; and it is further,

Ordered that the order entered October 3, 2000, is affirmed insofar as appealed from, without costs or disbursements.