OPINION OF THE COURT
Lawrence S. Knipel, J.
This is a proceeding pursuant to CPLR article 78 challenging the approval of a project known as the Brooklyn Bridge Park. Respondents separately cross-move to dismiss the petition. Petitioners cross-move for a trial.
Respondent Brooklyn Bridge Park Development Corporation (BBPDC) is a subsidiary of respondent New York State Urban Development Corporation, doing business as Empire State Development Corporation, a public benefit corporation of the State of New York. The intervenors-respondents (the City respondents) are the Mayor of the City of New York, the Commissioner of the New York City Department of Parks and Recreation, the Department of Parks and Recreation, and the City of New York.
On May 2, 2002, Governor George Pataki and Mayor Michael Bloomberg signed a memorandum of understanding (MOU) *517 providing for the creation of BBPDC to plan, design and build Brooklyn Bridge Park (the project). The parties to the MOU agreed that the project would be guided by the provisions of an illustrative master plan (IMP) developed in 2000, which set forth a vision for a sustainable park providing recreational and cultural opportunities, “subject to any refinements thereto arising from the completion of the planning and environmental review processes for the Project.” In accordance with the illustrative master plan, the parties to the MOU agreed that no less than 80% of the project would be reserved as open space and would be dedicated as parkland, and that “development of appropriate commercial uses may occur within the Project area,” provided that all revenues derived therefrom be used exclusively for the maintenance and operation of the project. The BBPDC was charged with developing a general project plan (GPP) guided by the illustrative master plan. The MOU further provided “All commercial development within the Project area shall be guided by the character and quality of commercial development specified in the Illustrative Master Plan, as further defined in the General Project Plan,” with all revenue dedicated to the maintenance and operational needs of the project.
The illustrative master plan itself makes no reference to residential development, although there is reference to a marina and the possibility of a hotel. In addition, the illustrative master plan refers to the “13 Guiding Principles” stating the park will be designed consistent therewith. The eighth principle, entitled “Develop a Fiscally Prudent Plan,” provides, in part, “Specialized commercial uses (e.g. executive conference center/ destination resort, restaurants, maritime center) shall be encouraged and residential and office uses shall be discouraged.” The site was to have “only so much commercial development in a park-like setting as is necessary to enliven the area, to provide security and to finance ongoing operations.”
According to the general project plan adopted July 26, 2005, the project would “provide the surrounding communities with a major new precinct of outdoor public recreation and the opportunity to experience the waterfront directly,” offering “unparalleled access to the water, making innovative use of boardwalks, floating bridges, and canals that would wind along the water’s edge.” It would include “rolling hills, marshland, and abundant recreational opportunities with multi-purpose playing fields, playgrounds, shaded ball courts, open lawns, and *518 12 acres of safe paddling waters.” There would be recreational facilities, field sports, water recreation areas for kayaking, a marina, bicycle paths and a greenway, civic lawns, and opportunities for cultural recreation.
The GPP noted that the MOU “require [d] that the park be financially self-sustaining” and that “development parcels may not constitute more than 20 percent of the Project.” The GPP proposed that development parcels make up only approximately 10% of the project’s area, more than half of which is presently occupied by existing structures such as the Empire Stores and 360 Furman Street. However, the development proposed by the GPP included residential buildings. Two options were proposed for the residential development proposed for the upland area of Pier 6: one building 315 feet in height with up to 290 units, or two buildings 215 feet high with up to 190 units each. An existing building known as Building 50 would be converted to residential use and would be increased in height from 43 to 54 feet and would have up to 50 units. The existing building at 360 Furman Street would be converted from manufacturing use to residential use. Two stories could be added increasing the height from 146 to 169 feet with up to 500 units.
Upland of Pier 1 a mixed use hotel and residential development was proposed on the site of existing warehouse buildings. Two buildings were contemplated, one 55 feet high and one 100 feet high. The residential use would range from 150 to 180 units and the hotel would range from 170 to 225 rooms. All of these structures were designed to leave harbor views from Brooklyn’s Promenade unobstructed.
Petitioners, Brooklyn Bridge Legal Defense Fund, Inc., a not-for-profit corporation, and the Fund’s president and treasurer, “favor creation of a public park without private housing or parking or a marina.” The petition contends that the determination to approve the project was arbitrary and capricious, affected by an error in law and an abuse of discretion, based on four causes of action. In the first, petitioners argue that pursuant to the 2002 State-City MOU and a similar memorandum of understanding between the Port Authority and BBPDC, the parcels were conveyed for the purpose of creating a public park. Since, according to petitioners, the private housing, private parking spaces and the marina are located within the proposed public park or at its entrances, the private uses within the proposed public park would violate the “public trust doctrine” by which land acquired for a public park may not be used for private commercial activity without express legislative approval.
*519 Secondly, petitioners contend that the proposed park violated the State-City MOU, which provided that the project would be guided by the provisions of the illustrative master plan, which, in turn, called for no less than 80% to be reserved for open space and for “the development of commercial uses” on the remainder so long as revenues derived therefrom would be used for the maintenance and operation of the project. According to petitioners, private housing, private parking, and a marina are not consistent with the illustrative master plan.
Thirdly, the petition contends that the final environmental impact statement (FEIS) is defective in that it contains an incomplete and inadequate study of impacts and therefore fails to meet the State Environmental Quality Review Act’s (SE-QRA) “hard look” standard. Specifically it does not take into account the impacts from the Atlantic Yards project occupying a 22-acre site within 1.5 miles of the proposed park. In addition, petitioners contend that the FEIS is segmented in that the park and the Atlantic Yards project should be viewed as part of one plan.
The final cause of action contends that the illustrative master plan, which received widespread support and contains no private housing or private parking, was a reasonable alternative to the proposed project and “must be studied under SEQRA.”
In support of the petition, petitioners submit an affirmation by Robert Chira, and affidavits by Bronson Binger, a former Assistant Commissioner of the Parks Department and an “expert on the planning and design of public parks,” and Brian T. Ketcham, PE., a principal of three consulting firms.
The State and City respondents separately cross-move to dismiss the petition. In support of their motion to dismiss, the State respondents submit affidavits from Wendy Leventer, the president of BBPDC, Charles A. Gargano, the chairman and commissioner of the Urban Development Corporation, doing business as Empire State Development Corporation, Michael R. Van Valkenburgh, a landscape architect and park designer whose firm was the lead consultant to BBPDC in the master planning and design of the park, Edward Applebome, the vice-president and chief operating officer of an environmental planning firm involved in preparing the environmental impact statement for the project, Signe Nielsen, principal of a firm of landscape architects retained by BBPDC as a park planning consultant, and Philip A. Habib, EE., whose firm was responsible for preparing the chapters on traffic and parking, and transit and pedestrians for the final environmental impact statement.
*520 These affidavits state that the 85-acre project would include approximately 77 acres of new land and water-based recreational amenities, including a 12-acre safe water area. To support these amenities, the project includes eight acres of revenue-generating development, including hotel, residential, retail and restaurant uses, ancillary office space and parking. The illustrative master plan was not based on a detailed design, engineering or financial feasibility studies, and was not intended to be a final or set plan for the construction of the park.
It is also alleged that it was intended by the Governor and Mayor to require that the park’s maintenance and operations budget be derived entirely from revenues generated by commercial uses to be located on no more than 20% of the project’s total area. The development team projected that the park’s annual maintenance and operations budget would be $15.2 million in 2004 dollars, and made financial analyses to identify the appropriate scope and type of development that would generate the necessary revenues. Residential and hotel uses were selected because they were the most economically effective in meeting the primary goals of yielding the greatest possible amount of open space and the least amount of development. Detailed engineering and feasibility studies were conducted and a number of changes from the illustrative master plan were proposed, such as determining that the marina would be better placed between Piers 4 and 5 rather than Piers 1 and 2 due to river currents and silt buildup. Also, in the words of Mr. Van Valkenburgh, the illustrative master plan “did not (and was never intended to) represent a viable final park plan, and was incapable of being implemented as such for a number of critical reasons.”
Respondents also noted that the GPP represents the maximum build-out within the project, and, if market conditions allow for less development to support the park’s needs, the development would be reduced accordingly. All of the residential development parcels were located at the extreme edges of the project, outside the park, and neighbor on existing residential development outside the project area. The biggest challenge to the success of the park, it is alleged, was its isolation from existing neighborhoods, and residential development, in addition to being preferable to other forms of development, would provide additional security for park users that would improve the experience and operation of the park.
Respondents further contend that there is widespread support for the project by neighborhood associations, elected of *521 ficials and park advocacy groups. In addition, the Legislature amended the Real Property Law to permit condominiums in the project by allowing condominiums on ground leases for which BBPDC is the holder of the landlord’s leasehold interest. Moreover, the Urban Development Corporation Act was amended to provide that payments in lieu of taxes shall be paid by BBPDC from the development parcels in an amount equal to the real property taxes that would otherwise be due.
The City respondents submit affidavits by Katherine Collignon, vice-president for special projects at the New York City Economic Development Corporation (EDC), who provided assistance to BBPDC in its development of the financial projections for the project and who evaluated those projections. Based on its review, the City EDC has concluded that the decision to include residential housing in the project was appropriate. Limited commercial facilities, such as restaurants and snack bars, would not generate sufficient revenues to fund operation and maintenance costs. Residential housing was an optimal alternative: it required smaller footprints; it was generally compatible with park use; it is feasible due to ample demand; and it would provide a vibrant atmosphere to support the park. Office space and retail uses had drawbacks that would be detrimental to park use, and a multi-use destination recreational facility would not generate sufficient revenue and its viability was financially questionable. Residential housing was the best alternative because it would minimize the land needed for non-park use, generate a reliable and sufficient revenue stream, and create a lively and vibrant neighborhood surrounding the park.
The affidavits of Joshua Laird, the Assistant Commissioner for Planning and Natural Resources with the New York City Department of Parks and Recreation, and Daniel L. Doctoroff, the Deputy Mayor for Economic Development and Rebuilding for the City of New York are also submitted.
In opposition to the motion to dismiss and in further support of the petition, petitioners submit an affirmation of Robert Chira, a further affidavit of Bronson Binger, an affidavit of Brian Ketcham, PE., and an affidavit of petitioner Robert Stone, taking issue with many of respondents’ assertions.
In reply, respondents submit the reply affidavits of Edward Applebome, Michael Van Valkenburgh, Philip A. Habib, PE., and Joshua Laird.
The questions presented are whether petitioner can show that respondents’ determination was arbitrary, capricious, or *522 otherwise improper, and whether the petitioners’ causes of action for challenging the respondents’ determination can withstand respondents’ motions to dismiss.
The Public Trust Doctrine
The first cause of action alleges that respondents’ determination allowing for construction of private uses on development parcels violates the public trust doctrine. “Dedicated park areas in New York State are impressed with a public trust, and their use for other than park purposes requires direct and specific approval by the State Legislature” (Matter of Jones v Amicone, 27 AD3d 465, 470 [2d Dept 2006]; see Friends of Van Cortlandt Park v City of New York, 95 NY2d 623 [2001] [although a water treatment plant serves an important public purpose, it cannot be built without the specific approval of the Legislature in the subject park, dedicated as parkland by an act of the Legislature in 1884]; Williams v Gallatin, 229 NY 248 [1920] [no objects however worthy which have no connection with park purposes should be permitted to encroach upon a park without legislative authority plainly conferred]; Johnson v Town of Brookhaven, 230 AD2d 774 [2d Dept 1996] [the use of public parkland for private summer cottages was an improper use]; Grayson v Town of Huntington, 160 AD2d 835 [2d Dept 1990]). However, a municipality may hold property either in its corporate capacity as an ordinary proprietor, or solely for the public use, and whether it can devote its property to a private use depends upon the capacity in which it holds title (Kenny v Board of Trustees of Inc. Vil. of Garden City, 289 AD2d 534 [2d Dept 2001] [property was impressed with a public trust where defendants’ intent was to acquire the property for recreational uses and the property was so utilized]).
“To establish that property has been dedicated for public use, there generally must be unequivocal express or implied offer by the owner and, where required, an express or implied acceptance by the public . . . The burden of proof rests on the party asserting that the land has been dedicated for public use” (Matter of Angiolillo v Town of Greenburgh, 290 AD2d 1, 10-11 [2d Dept 2001] [because the subject lots were acquired for the purpose of creating a parkway, they were not expressly dedicated as a park]).
Petitioners contend that the property for the project was impressed with a trust for the public’s use, and thus the develop *523 ment of private housing violates the public trust doctrine. This court cannot agree. It cannot be disputed that the properties designated by the GPP for private development are not currently used as parkland or for any other public use. Nor is there any indication that the parcels that were conveyed were offered by the owners or accepted by BBPDC as dedicated public parkland. On the contrary, the MOU between the Port Authority and BBPDC plainly recites that the Port Authority agreed to convey property for inclusion in the park “and use of certain portions of the Property as public parkland consistent with the General Project Plan to be developed hereafter.” The parties to the State-City MOU agreed that “in accordance with the Illustrative Master Plan, no less than eighty (80) percent of the project will be reserved as open space and will be dedicated as parkland that is subject to the protective provisions of State and City law pertaining to park properties” (emphasis added). That MOU farther provides that
“[u]pon completion of the construction of the Project or phases thereof, the state-owned areas designated as open space under the General Project Plan . shall be transferred to the jurisdiction of State Parks and shall be afforded the protections of state law relating to the non-alienation of State park lands . . . The City-owned areas designated as open spaces under the General Project Plan shall be managed in cooperation with the State-owned areas designated as open space with the intention of providing a unified and seamless park experience for park visitors” (emphasis added).
Indeed, from the project’s very inception in the “13 Guiding Principles” endorsed by Brooklyn’s Borough President and area federal, state and city legislators some 14 years ago, commercial nonpark uses were contemplated as a means of sustaining the proposed Brooklyn Bridge Park (see principle No. 8).
In the plan as proposed, approximately 90% of the project will be open space, leaving the remaining 10% to be used as development sites. Only those portions of the project designated as open space pursuant to the GPP will be dedicated public parkland and afforded the protection of state law which prohibits development without approval of the Legislature, which, parenthetically, has twice enacted legislation necessary for the inclusion of residential occupancy in the project. In 2005, the Real Property Law was amended to permit condominiums on ground leases for which Brooklyn Bridge Park Development *524 Corporation is the holder of the landlord’s leasehold interest, and in 2006 payments in lieu of taxes on residential condominiums were provided for at the Brooklyn Bridge Park Civic Project. These laws evidence clear legislative intent to further the planned residential (and commercial) activities envisioned in the GPP
For at least the past 86 years New York has rightfully maintained a strong public policy which favors protection of our public parkland (see Williams v Gallatin, supra). While this doctrine continues unabated, beyond peradventure, the parcels designated for residential/commercial development herein are not parkland, have never been parkland and were never designated to become parkland. As such, they fall entirely outside the scope of our public trust doctrine.
The State-City Memorandum of Understanding
The second cause of action alleges that respondents’ approval of the GPP and FEIS violated the State-City MOU because it is not consistent with the provisions contained in the IMP This, too, is without merit. Firstly, the MOU plainly states that it was “for the sole and exclusive benefit of the PARTIES hereto and no other person or entity is intended to be a beneficiary hereof nor may such person or entity claim or be entitled to any right or benefit of any nature whatsoever in connection herewith.” Thus, petitioners have no standing to enforce the MOU (see Mendel v Henry Phipps Plaza W., Inc., 6 NY3d 783 [2006] [plaintiffs had no standing to enforce purported third-party beneficiary rights under a land disposition agreement between the City and defendant, since, inter alia, the agreement explicitly negated any intent to permit enforcement by third parties]).
More fundamentally, petitioners’ attempts to show that the MOU was violated are without merit. The claimed violations are, essentially, that a plan was not proposed consistent with the IMP which did not mention housing, and that respondents “twist[ed] the revenue provision out of shape” by requiring that operational and maintenance costs are met by commercial activities. Petitioners are correct that the MOU and the IMP do not explicitly mandate that the park be financially self-sustaining. But the MOU does provide that the IMP sets forth a vision for a “sustainable” park and that development of commercial uses may occur within the project provided that all revenues derived therefrom be used exclusively for the mainte *525 nance and operation of the project. Respondents include affidavits of the City and State officials who were “directly involved” with the negotiations surrounding the MOU, were “intimately involved in the MOU’s creation, terms and execution,” and were therefore undoubtedly familiar with the intent of the parties, who unequivocally state that they always intended that the project be financially self-sustaining. More importantly, the MOU acknowledged that the IMP was a guide only, not definitive as to what development was permissible, and that it was subject to any “refinements” arising from the completion of the planning and environmental review process. The MOU thus provided that commercial development was to be guided by the IMP “as further defined” in the GPP
SEQRA
The third and fourth causes of action allege that the FEIS failed to meet the requirements of the State Environmental Quality Review Act. Judicial review of a determination pursuant to SEQRA is guided by the general standards of review of administrative proceedings, i.e., whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion (see Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 416 [1986]). In assessing an agency’s compliance with the mandates of the statute, courts must review the record to determine whether the agency identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis for its determination (see Akpan v Koch, 75 NY2d 561 [1990]; Matter of Jackson v New York State Urban Dev. Corp., supra, 67 NY2d at 417).
In the instant proceeding, respondents have satisfied their obligations under SEQRA by taking a hard look at the anticipated environmental impacts of the proposed project in the FEIS, which fully analyzed, among other things, the impact on traffic, parking and pedestrians, the impact of noise and construction, consideration of community facilities, neighborhood character, water quality and natural resources, and the consideration of alternatives. Petitioners show many areas in which they disagree with respondents, but they have not convincingly shown that respondents failed to identify the areas of environmental concern or that it did not take a hard look at them. “In a statutory scheme whose purpose is that the agency decision-makers focus attention on environmental concerns, it *526 is not the role of the courts to weigh the desirability of any action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively” (Matter of Jackson v New York State Urban Dev. Corp., supra, 67 NY2d at 416).
Certainly the purported failure to consider the IMP as a reasonable alternative to the proposed project is not a basis to reject the FEIS. The record clearly shows that, as respondents contend, the IMP was not, and was never intended to represent, the final park plan. The MOU provided that the project would be guided by the IMF] but subject to any refinements arising from the completion of the planning and the environmental review processes. Some portions of the IMP have proved impractical and others impossible to implement. For example, the large swimming pool envisioned in the IMP could not be supported by the pier on which its placement was planned. The purported failure, then, to consider the IMP as a reasonable alternative was not arbitrary or capricious or otherwise a violation of SEQRA.
Nor is the contention that respondents engaged in impermissible segmenting of any avail to petitioners. Segmentation occurs when the environmental review of a single action is broken down into smaller states and addressed as though they were independent and unrelated (see Matter of Teich v Buchheit, 221 AD2d 452 [2d Dept 1995]; Matter of Schultz v Jorling, 164 AD2d 252 [3d Dept 1990]; 6 NYCRR 617.2 [ag]). The regulations prohibiting segmentation were designed to guard against a distortion of the approval process by preventing a project with potentially significant effects from being split into two or more smaller projects, each falling below the threshold requiring full-blown review (see Matter of Maidman v Incorporated Vil. of Sands Point, 291 AD2d 499 [2d Dept 2002]; Matter of Teich v Buchheit, supra).
In the instant case, however, there is nothing in the record to indicate that the subject project, a waterfront park with some supporting development, and the Atlantic Yards project are functionally, conceptually or otherwise related, or that they are part of the same overall development plan to require analysis of cumulative impacts (cf. Matter of Long Is. Pine Barrens Socy. v Planning Bd. of Town of Brookhaven, 80 NY2d 500, 514 [1992] [the decisive factor in determining whether or not lead agencies would be required to consider the cumulative impact of other pending proposals, despite the absence of common ownership or *527 functional connection, was whether a “larger plan” exists for development, not the proposed projects’ common geographical base]; Matter of Halperin v City of New Rochelle, 24 AD3d 768 [2d Dept 2005] [analysis of cumulative impact of proposed project in connection with other planned or anticipated development in the vicinity was not required where the anticipated development and the proposed project were unrelated and not part of a common overall plan of development]).
Petitioners’ contention that the respondents’ proposed budget is too high and their disagreements with just about every other assumption and conclusion reached by respondents are not actionable in this proceeding. Respondents have wide discretion in creating the subject park, and in implementing it as a financially self-sustaining entity. Not only have petitioners not shown that this discretion is in violation of the MOU, they have not shown that the studies and conclusions reached by respondents are arbitrary, capricious or otherwise unreasonable.
Underlying all of petitioners’ arguments is a fundamental disagreement with respondents’ determination to make the Brooklyn Bridge Park Project self-sustaining. While this court is sympathetic to petitioners’ position that parks should not be burdened with the cost of their own maintenance, this is a disagreement of philosophy, not law.
The great parks of our City, Prospect Park and Central Park, were established on the proposition that parkland was of such intrinsic worth that it should be established and supported at the public’s expense. Respondents’ determination that the Brooklyn Bridge Park should be established, but not supported at the public’s expense may be philosophically regrettable, but is certainly not unreasonable or unlawful. Only in the political arena, not the courthouse, may such differences be resolved.
In sum, upon a review of the record in this case, and after oral argument, petitioners have failed to state causes of action that the respondents acted in an arbitrary, capricious, unreasonable or unlawful manner. Accordingly, respondents’ cross motions to dismiss the petition is granted. The petition is dismissed. Petitioners’ cross motion for a trial is denied as academic.